**David E. JOINER and Ruth E. Joiner, Plaintiffs,**

v.

**RYDER SYSTEM INC., et al., Defendants.**

No. 94–3064.

United States District Court, C.D. Illinois, Springfield Division.

March 15, 1996.

Robert G. Heckenkamp, Heckenkamp, Simhauser, Ward & Zerkle, Springfield, IL, Brian M. Wendler, Carlson, Wendler & Assoc., P.C., Edwardsville, IL, for plaintiffs.

Michael J. Pitzer, Rabbitt, Pitzer, Snodgrass, P.C., St. Louis, MO, Randall Abbott, Abbott Law Offices, Springfield, IL, for Ryder Automotive Operations, Inc.

Michael J. Pitzer, Brown & James, Belleville, IL, Randall Abbott, Abbott Law Offices, Springfield, IL, for Ryder System Inc., Ryder Automotive Carrier Group Inc.

RICHARD MILLS, District Judge:

Is Ryder System Inc. the *alter ego* of its subsidiaries? No.

Is Ryder system Inc. the *apparent manufacturer* of its subsidiaries' products? No.

Does Ryder System Inc. have the *duty to control* the products of its subsidiaries? No.

Summary judgment is granted in favor of Ryder System Inc.

## I. BACKGROUND

This diversity action arises out of an injury to David E. Joiner—a citizen of the State of Illinois—which occurred on June 23, 1993. Joiner, while performing his normal work duties as a driver for Complete Auto Transit, Inc. ("CAT"),[1] sustained severe and permanent injuries to his back, hip, and leg while attempting to pull out skids located at the rear of a trailer.[2] The trailer was manufactured by Delavan Industries, Inc. In general, Joiner alleges that the trailer was defective and unreasonably dangerous.

Joiner initiated this action sounding primarily in strict products liability and negligence against Ryder System Inc. ("RSI"), Ryder Automotive Carrier Group ("RACG"), and Ryder Automotive Operations, Inc. (RAOI)—a successor by merger to Delavan.

RSI—a Florida corporation—is a holding company, *i.e.*, it is engaged in the business of investing and acquiring other companies.[3] RSI owns 100% of the stock of RACG—also a Florida corporation. RACG, in turn, owns 100% of the stock of RAOI—a Florida corporation.[4]

---

1. CAT was subsequently merged into Commercial Carriers, Inc., a wholly owned subsidiary of Ryder Automotive Operations, Inc. Accordingly, Commercial Carriers, Inc., is now Joiner's employer. For the purposes of this opinion, however, the Court will refer to CAT as Joiner's employer.

2. The trailer at issue is of the type used for transporting automobiles—it can carry up to 12 automobiles.

3. Incidentally, there is no corporation by the name of "Ryder." Rather, "Ryder" is merely a general term used to refer to the "family" of corporations—approximately 100—owned directly by RSI or indirectly through subsidiaries owned by RSI.

4. RAOI and RACG were incorporated in 1991 as part of RSI's corporate restructuring.

The company formerly known as Delavan was, as noted, the manufacturer of the trailer at issue. Prior to the merger with RAOI, Delavan was a wholly owned subsidiary of RSI. When RAOI merged with Delavan, RAOI assumed the obligations and liabilities of Delavan regarding trailers manufactured before January 1, 1994.[5]

RACG and RAOI belong to RSI's Automotive Carrier Division ("ACD"). The ACD is not a corporate entity. Rather, it is a term used to describe a group of sister subsidiary trucking and trucking-related service corporations of RACG and RAOI.[6] The ACD does not have offices, administrative staff, or employees. All employees who are considered to be employees of the ACD are actually employees of either RACG, RAOI, or another trucking or trucking-related corporation within the ACD.

## II. STANDARD—SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir.1985). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Unquestionably, in determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90

S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist*, 833 F.2d 639 (7th Cir.1987).

## III. DISCUSSION

The instant summary judgment motion pertains only to Joiner's claims against RSI—the parent holding company. It appears to the Court that Joiner offers three independent arguments as to why RSI should remain in this case. *First,* Joiner claims that RSI is the alter ego of its ACD—namely, RACG and RAOI (which includes Delavan by merger). *Second,* Joiner claims that RSI held itself out as the "apparent manufacturer" of the alleged defective trailer; thus, RSI should be held liable as if it were in fact the manufacturer. *Third,* Joiner claims that RSI had the right to control the products and/or services of its subsidiaries—namely, Delavan (the manufacturer of the trailer)—thus, RSI should be held liable for the injuries resulting from the alleged defective trailer. Each argument will be addressed in turn.

### A. *Alter Ego*

Before discussing the merits of Joiner's alter ego argument, the Court would like to comment on an issue the parties ignored. Both parties have assumed, without discussing, that Illinois law applies to the alter ego issue. It appears to the Court, however, that the parties' assumption is likely erroneous. Since RSI is the parent corporation and RSI is incorporated in the State of Florida, under Illinois choice of law principles it appears that Florida law governs disputes surrounding whether RSI's corporate form will be disregarded—*not* Illinois law.[7] *Mark I, Inc.*

---

5. Although Delavan no longer exists as a result of its merger with RAOI, the Court will refer to it throughout the opinion as if it were still in existence.

6. RSI also groups its subsidiaries into a Vehicle Leasing and Services Division and an International Division.

7. The law of the state of incorporation of the parent corporation may not necessarily apply in every situation. *See Kolson v. Vembu*, 869 F.Supp. 1315, 1323 (N.D.Ill.1994). The state of incorporation, however, is a good place to start when determining which state's law is applicable. Here, RSI, RACG, and RAOI are Florida corporations. RSI has its principal place of

*v. Gruber*, 38 F.3d 369, 371 (7th Cir.1994) (Analyzing Connecticut law to determine whether a Connecticut corporation's veil should be pierced); *Kolson v. Vembu*, 869 F.Supp. 1315, 1323 (N.D.Ill.1994) (Analyzing Wisconsin law to determine whether the corporate veil should be pierced where corporation was incorporated and had principal place of business in Wisconsin and sole shareholder was a citizen of Wisconsin); *United Nat'l Records Inc. v. MCA, Inc.*, 616 F.Supp. 1429, 1431 (N.D.Ill.1985) ("In this case, [the parent company] is a California corporation, ... California law must be utilized" to determine if the parent is liable for the acts of its subsidiary.); *Heyman v. Beatrice Co.*, No. 89–C–7381, 1995 WL 151872 (N.D.Ill. April 3, 1995).

Regardless, since both parties assume that Illinois law applies to the alter ego issue, the Court will not disturb that assumption, nor will it hold otherwise. Illinois law therefore applies. *Vukadinovich v. McCarthy*, 59 F.3d 58, 62 (7th Cir.1995) ("[C]hoice of law, not being jurisdictional, is normally ... waivable."); *Wood v. Mid–Valley, Inc.*, 942 F.2d 425, 426–27 (7th Cir.1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits. * * * [The] courts are not required to create issues where the parties agree. * * * Courts do not worry about conflict of laws unless the parties disagree on which state's law applies.").

■ In the State of Illinois (as in every state), "[a] corporation is a legal entity separate and distinct from its shareholders, directors, and officers." *In re Rehabilitation of Centaur Ins. Co.*, 158 Ill.2d 166, 198 Ill. Dec. 404, 406, 632 N.E.2d 1015, 1017 (1994). That same principle "applies even where one

corporation wholly owns another and the two have mutual dealings." *Id.* To disregard that well-established principle, a plaintiff has a "substantial burden" to overcome. *Kelsey Axle & Brake Div. v. Presco Plastics*, 187 Ill.App.3d 393, 135 Ill.Dec. 4, 8, 543 N.E.2d 239, 243 (1989). Indeed, "in general, a parent corporation may not be held to account for the liabilities of a subsidiary unless the legal separateness of parent and subsidiary has been disregarded in a wide range of corporate matters." *Esmark Inc. v. N.L.R.B.*, 887 F.2d 739, 753 (7th Cir.1989).

■ Pursuant to the Illinois alter ego doctrine, the courts will pierce the corporate veil only when: (1) there is "such unity of interest and ownership that the separate personalities of the [corporations] no longer exist;" and (2) the circumstances are "such that adherence to the fiction of separate corporation existence would sanction a fraud or promote injustice."[8] *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 462 (7th Cir.1991), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *accord, Hystro Products Inc. v. MNP Corp.*, 18 F.3d 1384, 1388–89 (7th Cir.1994).

### 1. Unity of Interest and Ownership

■ Regarding the first element, the plaintiff must show the degree of control by the parent corporation by presenting evidence of: (1) misrepresentation; (2) commingling of funds, assets, or identities; (3) undercapitalization; (4) failure to operate at arms length; and (5) failure to comply with corporate formalities. *Lumpkin*, 933 F.2d at 463 (citing, *Koch Refining v. Farmers Union Central Exch. Inc.*, 831 F.2d 1339, 1345 (7th Cir.1987)).[9]

There is no argument by Joiner of misrepresentation, nor is there an argument that

business in Florida; RAOI's principal place of business is New York; RACG's principal place of business is Michigan. It appears Florida law should apply, but that is not entirely clear. It appears clear, however, that Illinois law should *not* apply.

**8.** RSI supports its analysis regarding the alter ego doctrine by relying primarily on the Seventh Circuit's decision in *CM Corp. v. Oberer Dev. Co.*, 631 F.2d 536 (7th Cir.1980). In fact, *CM Corp.* is

the only Seventh Circuit case cited by RSI on the issue. That case, however, essentially is no longer "good" law. *See Van Dorn Co. v. Future Chemical & Oil Corp.*, 753 F.2d 565, 570–71 and n. 1 (7th Cir.1985).

**9.** Some Seventh Circuit cases list only four requirements instead of five. *See Hystro*, 18 F.3d at 1389; *Sea–Land Serv., Inc. v. Pepper Source*, 941 F.2d 519, 521 (7th Cir.1991).

*any* of the subsidiaries within RSI's ACD—namely RACG and RAOI (and Delavan, the manufacturer of the trailer at issue)—are or were ever undercapitalized.[10] To the contrary, it appears the subsidiaries were and continue to be very profitable—they have no debt and always maintain a positive cash flow.

Additionally, there is no argument that RSI or any of its subsidiaries ever failed to comply with corporate formalities. Indeed, the unchallenged affidavit testimony of Serge Martin (Assistant General Counsel of RSI) and Michael Wagner (Executive Vice President of RACG) established that: (1) the corporate minute books of RSI, RACG, and RAOI are maintained separately; (2) there are no joint meetings of the RSI, RACG, RAOI (including Delavan) Boards of Directors; (3) RSI's corporate offices are in Miami, Florida, while RACG and RAOI's corporate offices are in Troy, Michigan; (4) RACG and RAOI maintain financial records and bank accounts separate and distinct from RSI; (5) the subsidiaries finance their day-to-day operations through their own cash flow; and (6) RSI does not get involved in the day-to-day operations of any of the companies in the ACD.[11] Finally, there is no argument that RSI and its subsidiaries failed to operate at arms length or commingled funds or assets.

It appears Joiner's sole argument regarding the unity of interest issue involves a commingling of identities. Specifically, due to the amount of control exerted, Joiner claims that RSI and its ACD—namely RACG and RAOI—are in reality one entity. Joiner offers numerous instances of alleged improper control by RSI over its ACD. As discussed below, however, the Court does not find any of the alleged instances of control improper. Indeed, the Court finds that the alleged improper acts amount to nothing more than a

parent corporation exercising permissible control over its corporate offspring.

■ *First,* Joiner notes that RSI owns 100% of the stock of RACG, which in turn owns 100% of the stock of RAOI, and the corporations have common officers and directors. Of course, as noted by the Seventh Circuit several decades ago, such factors are "common business practice and exist in most parent and subsidiary relationships." *Steven v. Roscoe Turner Aeronautical Corp.,* 324 F.2d 157, 161 (7th Cir.1963); *accord, Main Bank of Chicago v. Baker,* 86 Ill.2d 188, 56 Ill.Dec. 14, 21, 427 N.E.2d 94, 101 (1981); *Logal v. Inland Steel Indus., Inc.,* 209 Ill. App.3d 304, 154 Ill.Dec. 152, 157, 568 N.E.2d 152, 157 (1991) ("To hold otherwise would render virtually every subsidiary the alter ego of its parent."); *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1460 (2nd Cir.1995) ("Parents and subsidiaries frequently have overlapping boards of directors while maintaining separate business operations."). Accordingly, based on the paltry record before the Court on this particular issue, we cannot find anything improper here.

■ Similarly, Joiner is troubled by the fact that RSI elects the officers of the ACD. Of course, as discussed above, many parent/subsidiary relationships have common officers, *i.e.,* they serve as officers of both the parent and subsidiary. Additionally, as sole shareholder, RSI has the power to elect the Board of Directors of its wholly owned subsidiaries and, of course, the elected directors generally select the officers. Thus, RSI could achieve the same result by electing the wholly owned subsidiaries' directors (which may of course consist of some of RSI's officers and/or directors) and those directors could subsequently elect the same officers. Granted, the fact that RSI—instead of the subsidiaries' directors—elects the officers of the ACD is atypical of wholly-independent companies. But, that fact alone—without

---

**10.** The quality of Plaintiff's brief is wanting and the Court is uncertain as to the nature of Joiner's arguments. He simply throws all of his "facts" at the Court and expects the Court to do the work for him. There is no attempt to organize his arguments, nor does he state why particular "facts" are relevant to the Court's analysis. The Court, however, will do its best.

**11.** Joiner may argue that he has challenged RSI's assertion that it does not get involved in the day-to-day operations of its subsidiaries. As will be discussed in this opinion, however, Joiner has no evidence supporting that assertion.

more—is insufficient to pierce the corporate veil.[12] Especially, considering the fact that there is no evidence that RSI exerts improper control over the officers of the ACD.

■ *Second,* Joiner claims RSI's transfer of funds to the ACD subsidiaries evidences improper control. The unchallenged deposition testimony of Anthony Burns (President and Chief Executive Officer of RSI) established that—because the subsidiaries within the ACD are on a positive cash flow and have no debt—the only time cash is infused by RSI within the respective subsidiaries is when a particular subsidiary seeks to make an acquisition, *i.e.,* to purchase another company. Burns Dep. pgs. 20–22. Such transactions reflect nothing more than additional and continuing investments by RSI in its subsidiary corporations.

We also have no problem with the fact that RSI's approval is required before the purchase by the particular subsidiary. Indeed, several courts have acknowledged that it is entirely appropriate for a parent corporation to approve major capital expenditures of its subsidiaries. *See, e.g., Fletcher,* 68 F.3d at 1459–60 ("Indeed this type of conduct is typical of a majority shareholder or parent corporation."); *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.,* 842 F.2d 1466, 1476 (3rd Cir. 1988) (Subsidiaries required "to secure approval from their parent corporations for large investments and acquisitions or disposals of major assets."), *cert. denied,* 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 247 (1988); *Akzona Inc. v. E.I. Du Pont De Nemours & Co.,* 607 F.Supp. 227, 238 (D.C.Del.1984) (Parent corporation "oversees and approves major capital expenditures.").

■ *Third,* Joiner claims that the interaction between RSI and its subsidiaries regarding the annual capital budgeting process is evidence of improper control. The testimony of Mr. Burns established that RSI approves the annual capital budgets of its subsidiaries—the subsidiaries and RSI meet and they agree on a capital budget. The annual capital budget apparently represents the costs of purchasing new equipment and vehicles. Mr. Burns also testified that the individual subsidiaries supply the funds (from their own earnings) for their capital budgets. Burns Dep. pg. 177. Similar to RSI's approval of its subsidiaries' acquisitions, we find nothing improper with a parent approving its subsidiaries' capital budgets, especially considering Mr. Burns' unchallenged testimony that RSI has never reduced or denied a subsidiary's capital budget request. Burns Dep. pgs. 25–29.[13]

■ *Fourth,* Joiner apparently has a problem with the subsidiaries' transfer of cash to RSI. Mr. Burns' testimony established that the subsidiaries dictate the amount of money they need to fund their respective operations. Burns. Dep. pgs. 20–21. The funds in excess of that amount are transferred to RSI in the form of a dividend. Such a transaction represents nothing more than a return on an investment. Indeed, that's why RSI owns other corporations—to make money. Surely, RSI cannot make money from its investments in other corporations unless those corporations transfer their respective profits to RSI.

■ *Next,* Joiner argues that RSI's implementation of a safety policy, an environmental policy, a code of conduct, and a code of ethics evidences improper control. Mr. Burns' unchallenged testimony established that RSI has a general safety policy,[14] an environmental policy, and a code of conduct and ethics[15] which each subsidiary must ad-

---

**12.** Neither party has developed this particular issue.

**13.** Indeed, if RSI has never reduced or rejected a budget request, it does not appear that RSI is interfering in or controlling the capital budgeting process. Mr. Burns also testified that RSI does not get involved in approving the subsidiaries' operating expenses, *i.e.,* the day-to-day expenditures. Mr. Burns testified that the subsidiaries have adequate funds to cover such expenses and RSI has never allocated funds for that purpose. Burns Dep. pg. 177.

**14.** The safety policy states: "RSI and its subsidiaries and affiliates will not perform a service or transport or use a product unless it can be done in a safe manner." Burns Dep. pg. 46.

**15.** Mr. Burns described the code of conduct and code of ethics essentially as one code. It provides, in general, that RSI and its subsidiaries should conduct business in a professional, prop-

here to. Mr. Burns' testimony also provided, however, that each subsidiary is free to expand on RSI's general policies as they see fit and to adapt such policies to their individual environments. Burns Dep. pgs. 46–52, 144–45. The Court has no problem with RSI's implementation of such policies throughout its subsidiaries. Indeed, such policies demonstrate sound business judgment by a parent corporation. *Fletcher v. Atex, Inc.,* 861 F.Supp. 242, 245 (S.D.N.Y.1994) ("[I]t is entirely appropriate for a parent corporation to approve major ... policies involving the subsidiary ...."), *aff'd,* 68 F.3d 1451 (2nd Cir. 1995).

■ *Similarly,* RSI reviews the long-term strategies and goals of its subsidiaries to assure that such strategies and goals are in accordance and in line with RSI's expectations. The Court is not troubled by RSI's actions. Indeed, once again, such actions demonstrate responsible business judgment by a parent corporation. *Id.* ("[I]t is entirely appropriate for a parent corporation to approve major policies involving the subsidiary...."). There is no evidence that RSI gets involved in the day-to-day operations of the subsidiaries to aid or support the subsidiaries in reaching those goals.

■ *Next,* Joiner claims that RSI provides services to its subsidiaries. Joiner is correct, RSI does provide services to its subsidiaries. The unchallenged testimony of Mr. Burns and affidavit testimony of Mr. Martin provide, however, that RSI offers centralized services—such as legal services, printing services, and cash management services—to its subsidiaries for a fee. Mr. Burns also noted that the subsidiaries are not forced to obtain the services through RSI, rather, they have the option to "go outside" RSI and obtain such services from another source. Burns. Dep. pg. 175. We find nothing improper here. The fact that RSI requires the subsidiaries to pay a fee and allows them to obtain the services from

another source supports RSI's argument that it is not the alter ego of any of its subsidiaries.

*Additionally,* Joiner claims that RSI sets the prices charged by the subsidiaries within the ACD. Mr. Burns' testimony and Mr. Wagner's affidavit provide that RSI does not control the prices charged by the subsidiaries within the ACD. The sole evidence in support of Joiner's claim is a statement by Mr. Burns in a 1990 periodical: "Ryder has strengthened our stride, quickened our pace in our marketing activities and raised some prices, such as in our auto carriage business." That statement—clearly referring to "Ryder" as a family of corporations—is insufficient, by itself, to create a factual dispute as to whether RSI sets the prices its subsidiaries charge.[16] Indeed, it provides no evidence that RSI gets involved in the pricing decisions of its subsidiaries.

■ *Finally,* Joiner devotes most of his response to discussing RSI's creation of a Task Force pertaining to safety issues within the subsidiary corporations. The deposition testimony of James Herron (Senior Executive Vice President and General Counsel of RSI) established that RSI was concerned with the rising workers' compensation costs of its subsidiaries. Herron Dep. pg. 10. Accordingly, RSI directed Mr. Herron to organize a Task Force to analyze the workers' compensation costs throughout RSI's subsidiaries and draft a plan or policy to reduce such costs. Herron Dep. pg. 10. The Task Force's purpose was to raise consciousness and awareness about safety and accidents throughout the RSI subsidiaries. Herron Dep. pg. 17. Mr. Herron was joined on the Task Force with senior members from each of RSI's divisions. Herron Dep. pg. 15. As a result of the Task Force's efforts, a safety policy was created and adopted by RSI.

■ The Court does not find problematic the creation by RSI of a Task Force which was in existence only for a *limited* period of

---

er, and legal, honorable manner. Burns Dep. pgs. 49–50.

**16.** In *Kramer Motors, Inc. v. British Leyland, Ltd.,* 628 F.2d 1175, 1177 (9th Cir.1980), *cert. denied,* 449 U.S. 1062, 101 S.Ct. 785, 66 L.Ed.2d 604

(1980), the Ninth Circuit held that the parent corporation who, among several other things, worked closely with the subsidiary corporation on the of vehicles was not the alter ego of the subsidiary.

time. RSI directed its subsidiaries to join together with it to seek to improve safety and reduce injuries and costs associated with work-related accidents.[17] Without more, the Court does not believe the creation of such a short-lived Task Force evidences improper control on RSI's part.[18] If anything, RSI should be applauded for its attempt to improve safety throughout its "family" of corporations.

In summary, the Court cannot conclude that any of the subsidiaries within the ACD (or the division as a whole) are the alter ego of RSI. Granted, RSI is active in the affairs of its subsidiaries; but such activity does not infringe improperly upon the autonomy of the individual subsidiaries. *See Esmark, Inc. v. N.L.R.B.*, 887 F.2d 739, 759 (7th Cir. 1989) ("Parents and dominant shareholders are almost always 'active participants' in the affairs of an owned corporation. And, in the usual case, the exercise of such control over a subsidiary's actions is entirely permissible and does not result in the owner's personal liability.").

The Court grants that RSI is pushing the limits in some aspects; but, it also appears that RSI exerts only "general" control over its subsidiaries. That is, RSI ensures that its subsidiaries are on the "right" path: RSI approved their budgets and major capital expenditures, adopted general and long-term strategic policies, established a Task Force to improve safety, et cetera. That is not improper.

Importantly, there is no evidence that RSI interferes with the day-to-day management or operations of any of the subsidiaries. RSI allows the subsidiaries to manage their day-to-day activities as each sees fit. Thus, in that sense, RSI respects the separateness of the corporations. In short, based on the largely undeveloped record before us, the Court cannot conclude that the requisite "unity of interest" exists between RSI and any of its subsidiaries such that RSI's corporate veil should be justifiably pierced.[19]

### 2. Promote Injustice

Even if the unity of interest prong is satisfied, to pierce RSI's corporate veil Joiner is also "required to prove that adherence to the fiction of separate identities would

---

**17.** On one of the pages of voluminous notes from the Task Force, the words "build what we have carefully" and "design a better trailer" are hand written. Joiner claims that the note supports his claim that RSI was involved in the manufacture of the Delavan trailer. The Court disagrees. The note, standing alone, without any background or explanation as to who wrote it or why it was written is insufficient to create a factual dispute. Keep in mind, the Task Force consisted of individuals from all of RSI's divisions, including the ACD which, of course, manufactures the Delavan trailers.

Apparently, Joiner chose not to take any discovery pertaining to the Task Force notes. If Joiner argues that RSI did not turn over the notes in a timely manner, then Joiner should have sought to extend the discovery deadline to enable him to conduct such an investigation. It is now too late. Once the discovery deadline passes, there are no excuses.

**18.** Joiner states that the creation of the Task Force "clearly demonstrates the *right* to control by RSI." As will be more fully discussed in part "C" of this opinion, the Court does not need the creation of a Task Force to conclude that RSI had the right to control its subsidiaries. RSI *obviously* had the *ability* and *right* to control its subsidiaries. RSI owns them—RSI can do anything it wants with its subsidiaries. The issue is not whether RSI had the *right*, the *ability*, or the *power* to control its subsidiaries, the issue is whether RSI exerted *improper* control over its subsidiaries such that the corporate separateness should be disregarded.

**19.** Joiner submits the decision of *Sivula v. Ryder System. Inc.*, No.88–F–1877 (D.C.Colo. Oct. 26, 1989), and claims that it supports his position. Joiner is incorrect, however. In *Sivula*, the plaintiff argued that the ACD was the agent of RSI—there was no alter ego argument advanced. Here, Joiner advances no agency argument. Certainly, a corporation can be the agent of another corporation without being that corporation's alter ego. *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3rd Cir.1988), *cert. denied*, 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 247 (1988).

Joiner utilizes the term "agency" in a couple of places in his brief, but he fails to develop an argument that the ACD (or any corporations therein) was the agent of RSI for any particular purpose. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).").

'sanction a fraud or promote injustice.'" *Hystro Products, Inc. v. MNP Corp.*, 18 F.3d 1384, 1390 (7th Cir.1994). In *Hystro* the Seventh Circuit noted that in order to satisfy the second requirement, "some element of unfairness, something akin to fraud or deception, or the existence of a compelling public interest must be present in order to disregard the corporate fiction." *Id.*

■ Assuming RSI is the alter ego of its ACD (or any of its subsidiaries therein), it does not appear that Joiner could satisfy the second requirement. As noted by the Seventh Circuit in *Sea–Land Services, Inc. v. Pepper Source*, 941 F.2d 519, 522 (7th Cir. 1991), plaintiffs generally initiate claims against the parent corporation because of the prospect that the subsidiary will be unable to satisfy a judgment. But, that is not the case here. Indeed, the subsidiaries within RSI's ACD are very profitable—each could easily satisfy a large judgment against it. Although the undercapitalization of a subsidiary alone is *not* enough to establish the second requirement, id. at 522–23, it is generally considered a prerequisite.[20] Thus, considering that each subsidiary within RSI's ACD is very profitable and could readily satisfy a large judgment, why should the Court pierce RSI's veil? What fraud or injustice would ensue?

Joiner offers a two-sentence argument—unsupported by authority or citation to the record—as to why an injustice would result.[21] The extent of Joiner's argument is as follows:

> The corporate structure of this family of corporations encourages the employers to forego trailer modifications to render the equipment safer for the sole purpose of enabling those subsidiaries to pay higher divisions to RSI. This, in turn, results in the allocation by RSI of increased operating expenses and the issuance of higher bonuses to those subsidiary officers and directors.

The Court is uncertain as to the substance of Joiner's argument.[22] It appears Joiner is arguing that RSI, as a whole, jeopardizes safety for profits. If so, a similar conclusory argument was recently rejected by the Second Circuit. *Fletcher*, 68 F.3d at 1461 ("[T]he plaintiffs offer nothing more than the bare assertion that Kodak 'exploited' Atex 'to generate profits but not to safeguard safety.' ").

Or, is Joiner attempting to argue that RSI directed Delavan or its other subsidiaries to forego trailer modifications (assuming the trailer is defective) in order to reduce expenses and promote greater profits? But, there is no evidence that RSI was ever involved in the design of the Delavan trailers or that RSI ever instructed its subsidiaries (which purchase Delavan trailers) to forego trailer modifications. Indeed, the unchallenged testimony of Mr. Burns indicated that the subsidiaries could modify the trailers with their own funds without seeking permission from RSI. Burns Dep. pg. 31. Mr. Burns also indicated that RSI has no involvement with its subsidiaries' expenses pertaining to trailer maintenance. Burns Dep. pgs. 177–78. Accordingly, the Court concludes that Joiner has also failed to satisfy the second prong of the alter ego analysis.

---

**20.** In fact, in *Sea–Land Services, Inc.*, the Seventh Circuit could not understand why anyone would bring such a claim against the parent *unless* the subsidiary was unable to satisfy the potential judgment. *Id.* at 522. We think we've discovered another reason—punitive damages. RSI is presumably worth much more than its subsidiaries. The greater worth would of course justify a larger punitive damage award. *See Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1189 (7th Cir. 1992) (Under Illinois law, one of the relevant factors in determining the amount of punitive damages is "the financial status of the defendant."), *cert. denied*, 507 U.S. 917, 113 S.Ct. 1274, 122 L.Ed.2d 669 (1993).

**21.** Due to the inadequacy of the briefs, the Court ordered the parties to rebrief the summary judgment motion. Many of the arguments raised in Joiner's first brief were not raised in his second brief. Although those arguments were waived for failing to raise them again, the Court has addressed many of those arguments in the instant opinion anyway. In Joiner's second brief, he failed to discuss the "promote injustice" requirement. We could grant summary judgment against him for that reason alone. However, the Court will—once again—refer to the scant discussion of the issue in his first brief.

**22.** Joiner cites the Court to no evidence indicating that RSI pays bonuses to the officers and directors of its subsidiaries.

## B. *Apparent Manufacturer*

Next, Joiner claims that RSI is the "apparent manufacturer" of the Delavan trailers and, therefore, it should be liable as if it manufactured the trailer. Under the apparent manufacturer doctrine—a doctrine unique to strict products liability jurisprudence—" a company which holds itself out to the public as the manufacturer of a product is liable for the injuries caused by that product if it is found to be unreasonably dangerous." *Ogg v. City of Springfield*, 121 Ill. App.3d 25, 76 Ill.Dec. 531, 536, 458 N.E.2d 1331, 1336 (1984) *accord, Root v. JH Indus., Inc.*, 277 Ill.App.3d 502, 214 Ill.Dec. 4, 660 N.E.2d 195 (1995). "The primary rationale for imposing liability on the apparent manufacturer of a defective product is that it has induced the *purchasing public* to believe that it is the actual manufacturer, and to act on this belief—that is, to *purchase the product in reliance* on the apparent manufacturer's reputation and skill in making it." *Hebel v. Sherman Equip.*, 92 Ill.2d 368, 65 Ill.Dec. 888, 892, 442 N.E.2d 199, 203 (1982) (emphasis in original).

Based on a review of the rationale underlying the apparent manufacturer doctrine, it is clear that Joiner's argument is flawed fundamentally and RSI cannot be considered the apparent manufacturer of the trailers manufactured by Delavan. As stressed by the Illinois Supreme Court, "whether a holding out has occurred *must be judged from the viewpoint of the purchasing public.*" *Hebel*, 65 Ill.Dec. at 892, 442 N.E.2d at 203 (emphasis ours). Here, the "purchasing public" is CAT—Joiner's employer. CAT purchased the trailer at issue directly from Delavan.[23] Certainly, CAT—*a member of the "family"*—was aware that Delavan manufactured the trailer, and not RSI. Is Joiner attempting to argue that CAT—*a member of the Ryder "family"*—does not realize that RSI is a holding company, but instead believes that RSI manufactures trailers?

Thus, because RSI did not hold itself out to CAT as the manufacturer of the trailer, *i.e.*, RSI did not induce CAT to purchase the trailer on the belief that RSI manufactured it, RSI cannot logically be the apparent manufacturer of the trailer.[24]

## C. *Right to control?*

A common theme discussed in Joiner's response is that RSI had the ability or right to control its subsidiaries. Specifically, Joiner claims that RSI had the right to control the products and/or services of its subsidiaries—namely, Delavan—thus, RSI should be responsible for the injuries resulting from the alleged defective Delavan trailer.

The Court does not understand Joiner's argument. If Joiner is arguing that a parent corporation should be held accountable for its subsidiaries' products merely because the parent has the right, the power, or the ability to control its subsidiaries, such an argument is untenable. Indeed, *every* parent

---

**23.** The sales invoice unambiguously reflects that the trailer is a Delavan product.

**24.** In a further attempt to hold RSI liable under a strict products liability theory, Joiner argues that RSI had the ability to eliminate the alleged unsafe character of the trailer. He cites *Ogg v. City of Springfield*, 121 Ill.App.3d 25, 76 Ill.Dec. 531, 458 N.E.2d 1331 (1984), in support of his position. In *Ogg*, the court stated, "a parent company which participates in the manufacture, marketing, and distribution of an unsafe product, *or* which derives economic benefit from placing it in the stream of commerce, *or* which is in a position to eliminate the unsafe character of the product is liable for the loss caused by the product." *Id.* 76 Ill.Dec. at 536, 458 N.E.2d at 1336 (emphasis ours).

It appears that Joiner believes that the fact that RSI had the ability to eliminate the unsafe character of the alleged defective trailer is enough to hold RSI liable under a strict products liability theory. The Court does not agree—we could not locate one reported case where that fact *standing alone* was enough to warrant a finding against the parent corporation. The *Ogg* court did not even rely on that fact. *Id.* Indeed, as will be discussed in this opinion, every parent corporation has the *ability* to eliminate the unsafe character of its subsidiary's defective product.

The Court also notes that the *Ogg* court listed the factors for holding a parent corporation liable in the *disjunctive. Ogg* cites *Hebel* in support. But, in *Hebel*, the Illinois Supreme Court listed the factors in the *conjunctive, Hebel*, 65 Ill.Dec. at 894, 442 N.E.2d at 205, implying that *all* factors were required before liability would be imposed against the parent.

corporation—by virtue of its ownership interest—has the *right,* the *power,* and the *ability* to control the products of its subsidiary. In other words, the parent *owns* the subsidiary, it can do anything it wants with its subsidiary—the subsidiary has no choice but to obey. *See Esmark, Inc. v. N.L.R.B.,* 887 F.2d 739, 757 (7th Cir.1989) ("A parent corporation, by virtue of its ownership interest, may direct a subsidiary's actions, and the subsidiary will have no choice but to obey. A parent corporation may disregard the subsidiary's independence at its whim.").

 Or, perhaps Joiner is arguing that RSI was aware that Delavan trailers were potentially dangerous and thus should be held accountable for failing to order Delavan or other subsidiaries to redesign or modify the allegedly defective trailers. If so, Joiner essentially is asking the Court to impose upon RSI a "duty to control" the acts of its subsidiaries.

The Court could not locate a single reported case where such a duty was imposed. The Eleventh Circuit recently certified that issue to the Supreme Court of Alabama. *In re Birmingham Asbestos Litig.,* 997 F.2d 827 (11th Cir.1993). The Alabama Supreme Court held that "the 'duty to control' could not be used to hold a parent corporation liable for the acts of its subsidiary." *Id.* at 828–29; *accord, Fletcher,* 861 F.Supp. at 247 ("[A]bsent a 'special relationship' between Kodak and Atex ... Kodak had no duty to control Atex's conduct to prevent harm to the plaintiffs. *The parent/subsidiary relationship is not, without more, a 'special relationship' in this sense.*") (emphasis ours); *In re Silicone Gel Breast Implants Products Litig.,* 837 F.Supp. 1128, 1140 (N.D.Ala.1993) (Refusing to impose a "duty by shareholders—or at least corporate shareholders of a close corporation—to supervise activities of the corporation that can be reasonably anticipated to be injurious to third persons."); *see* **Restatement (Second) of Torts** § 315 cmt. b (1965) ("[T]he actor is not subject to liability if he fails, either intentionally or through inadvertence, to exercise his ability so to control the actions of third persons as to protect another from even the most serious harm. *This is true although the actor real-izes that he has the ability to control the conduct of a third person, and could do so with only the most trivial of efforts and without any inconvenience to himself.*") (emphasis ours).

## IV. CONCLUSION

RSI is certainly active in the affairs of its subsidiaries. But, the control it asserts is not improper. RSI establishes general policies and ensures that its subsidiaries stay on the right path. There is nothing wrong with that. Indeed, RSI is merely acting as a responsible parent. Importantly, RSI does not get involved in the day-to-day activities or management of the subsidiaries. Regardless, Joiner has failed to show why an injustice would ensue if the Court declined to pierce RSI's corporate veil.

The apparent manufacturer doctrine has no application in this case. Indeed, CAT—a member of the Ryder "family"—was certainly aware of the fact that Delavan manufactured the trailer, not RSI. Thus, RSI did not induce CAT to purchase the trailer on the belief that RSI manufactured it.

Finally, RSI—as every parent corporation does—obviously has the power to control its subsidiaries. In fact, RSI owns them and RSI can "force" them to do anything it wants. That power, by itself, however, does not impose a duty upon RSI. Only if RSI abused the power—by exerting too much control—could it be held liable for the conduct of its subsidiaries as an alter ego.

Such abusive control is not present here.

*Ergo,* RSI's motion for summary judgment is ALLOWED.